**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

JOSHUA GUIDE

v.

Civil No. 23-cv-467-LM-TSM
Opinion No. 2026 DNH 143

KLS MARTIN, LP

**ORDER ON MOTION TO COMPEL**

Plaintiff, Joshua Guide, sued his former employer, Defendant KLS Martin, LP, alleging wrongful termination and violations of the Americans with Disabilities Act ("ADA"). Doc. No. 1. The ensuing discovery process led to disagreement between the parties regarding KLS' assertion of the attorney-client privilege regarding certain deposition testimony and KLS' assertion of various privileges regarding documents identified in its privilege log. Doc. Nos. 55, 55-1. Plaintiff now moves to compel the production of those documents and deposition testimony, asserting that KLS improperly invoked the attorney-client privilege and/or the work-product doctrine, or alternatively, that KLS waived these privileges. Doc. No. 55-1. Defendant opposes the motion, arguing that it has not improperly invoked or waived any privilege. Doc. No. 57. For the reasons that follow and after careful review of the record,[1] Plaintiff's motion is denied.

[1] The record consists of: 1- the exhibits appended to Plaintiff's motion to compel, see Doc. Nos. 55-2 through 55-6; 2- the exhibits appended to Defendant's objection, see Doc. Nos. 57-1 through 57-27; 3- the exhibits appended to Plaintiff's reply to Defendant's objection, see Doc. Nos. 62-1 through 62-6; and 4- the exhibits included with Defendant's surreply, see Doc. Nos. 66-1 through 66-3.

## BACKGROUND

KLS is a medical device company, responsible for distributing implantable medical devices and related products to healthcare provider customers in the U.S. and Canada. Doc. No. 57 at pg. 2; see, e.g., Doc. No. 57-1 at ¶ 2. Plaintiff was employed by KLS as a District Manager and was promoted to Senior District Manager in January 2021. Doc. No. 55-1 at pg. 3; Doc. No. 55-2 at pg. 5.[2] In his role as both a District Manager and a Senior District Manager, Plaintiff was responsible for traveling throughout his district to assist sales personnel with inventory management, training, product demonstrations, and on-site customer support. Doc. No. 57-1 at ¶¶ 6-8. Keith Flower, a KLS Area Director, served as Plaintiff's supervisor during the relevant period of Plaintiff's employment with KLS. See id. at ¶¶ 3, 11.

In March 2020, "KLS was designated as a Critical Healthcare Infrastructure Industry Supplier per the United States Department of Homeland Security," and was "defined as a Critical Infrastructure (Healthcare) medical products supplier by the Department of Health and Human Services Centers for Disease Control and Prevention[.]" Doc. No. 57-17 at ¶¶ 30-31. KLS was directed by the Department of Homeland Security Cybersecurity and Infrastructure Security Agency ("CISA") to continue supplying medical products to healthcare provider customers, country-wide, throughout the COVID-19 outbreak. Id. To fulfill its obligations as a Critical Infrastructure supplier, it was necessary for KLS sales force employees to continue traveling to service healthcare providers, despite any state or local stay-at-home orders. Id. at ¶¶ 32-33. KLS actively sought legal advice from Attorney Gregory F. Lunny, a partner in the law firm Burr & Forman LLP, regarding compliance with this unprecedented situation. Id. at ¶¶ 4, 32. In response,

[2] Unless otherwise indicated, citations to page numbers in the supporting documents refer to the court's CM/ECF numbering system at the top right of the documents.

Attorney Lunny drafted, and KLS issued, a notice to local, county, and state law enforcement officials across the country, explaining that KLS sales personnel "were allowed and directed by the federal government to travel to and from healthcare provider customers during the pandemic" Id. at ¶ 33; see Doc. No. 57-3. KLS also issued an individualized copy of the notice to Plaintiff to present to relevant authorities within his district. Doc. No. 57-4.

KLS asserts that "[b]y early 2021, Mr. Flower noticed a significant change in [Plaintiff's] job performance." Doc. No. 57 at pg. 2. KLS contends Plaintiff "was not traveling throughout his District," and as a result, "KLS' relationships with healthcare provider customers and the performance [of] KLS' sales personnel in the District" suffered. Id.

Mr. Flower reported his concerns to KLS' Vice President of Sales, Paul Cantin, and informed Mr. Cantin that he planned to meet with Plaintiff in person to discuss his concerns regarding Plaintiff's performance. Id.; see Doc. No. 57-1 at ¶ 19; Doc. No. 57-12 at ¶¶ 5-8. Recognizing "the negative consequences that could flow from [Plaintiff's] inadequate job performance, and the resulting potential for legal liability to KLS' healthcare provider customers" and District personnel, Mr. Cantin then consulted with Attorney Lunny "regarding possible disciplinary action against [Plaintiff] and related legal considerations." Doc. No. 57-12 at ¶¶ 5, 9. It was ultimately decided that an employee performance improvement plan ("PIP") would be prepared, and Mr. Flower would bring the PIP to a meeting with Plaintiff regarding his performance to serve as an outline of talking points "to deliver verbal warnings or formally present as a written warning in case the counseling meeting did not go well." Doc. No. 57 at pg. 2; Doc. No. 57-7; see, e.g., Doc. No. 57-17 at ¶ 36. KLS asserts that "[i]n communications with Mr. Lunny, KLS' President, Will Ticoras, was made aware of these developments." Doc. No. 57 at pg. 2

(citing Doc. No. 57-1 at ¶¶ 19-20; Doc. No. 57-12 at ¶¶ 9-12; Doc. No. 57-16 at ¶¶ 7-13; Doc. No. 57-17 at ¶¶ 34-37).

On March 12, 2021, Mr. Flower and Plaintiff met in Boston, MA. Doc. No. 55-1 at pg. 3; Doc. No. 57-1 at ¶ 21. Although KLS characterizes the meeting as a "counseling meeting," Doc. No. 57 at pg. 2, Plaintiff states he "did not consider the meeting to be a counseling meeting, given that the men spent half the meeting discussing [KLS'] Mass General account." Doc. No. 55-1 at pg. 3. In any event, on March 15, 2021, Mr. Flower sent Plaintiff an email with the subject "Counseling Follow-Up," wherein Mr. Flower summarized key takeaways from their discussion, including Plaintiff's assurance that COVID-19 was not an impediment to fulfilling his managerial obligations, and Mr. Flower's request that Plaintiff develop a comprehensive travel plan with all employees in his district within five days. Doc. No. 55-2 at pgs. 15-16. That same day, Plaintiff responded, "Roger that," a phrase that Mr. Flower asserts Plaintiff commonly used to indicate his understanding. Doc. No. 57-8 at pg. 2; Doc. No. 57-1 at ¶ 24.

Even so, Mr. Flower's email prompted Plaintiff to reach out to his treating physician for guidance on COVID-19 exposure and travel limitations, given that he had suffered from Guillain-Barre syndrome (GBS) when he was a child. Doc No. 55-1 at pg. 3; Doc. No. 55-2 at pg. 4. Plaintiff's physician advised him that "'patients with co-morbidities including GBS may be at a higher risk for bad outcomes if they contract covid 19.'" Doc. No. 55-1 at pg. 3 (brackets omitted) (quoting Doc. No. 55-2 at pg. 12).

On March 22, 2021, Plaintiff emailed Mr. Flower, expressing embarrassment for not disclosing his health concerns sooner, and he informed Mr. Flower that he did not "feel safe traveling and interacting with people outside of [his] bubble for long periods of time" because he is "at a very high risk of having some serious and severe complications" if exposed to COVID-19.

Doc. No. 57-9 at pg. 2. Plaintiff attached a letter from his physician dated March 19, 2021, which stated that Plaintiff "has a history of medical conditions that put him at high risk for COVID-19 complications if exposed and is advised not to participate in any traveling." Id. at pg. 3.

Mr. Flower forwarded Plaintiff's March 22, 2021 email to Mr. Cantin and Mr. Ticoras to discuss its implications on district management. Doc. No. 57-1 at ¶¶ 29-30. Mr. Cantin then "consulted with [Attorney] Lunny and other Burr [&] Forman attorneys for legal advice and guidance" regarding Plaintiff's "medical condition," management concerns, and "related legal implications, including but not limited to a possible need to initiate an interactive process under the Americans with Disabilities Act." Doc. No. 57-12 at ¶ 18. Immediately upon receiving a copy of Plaintiff's email, Attorney Lunny engaged his Burr & Forman colleagues "who were ADA specialist attorneys," and from March 22, 2021 to April 19, 2021, Attorney Lunny "actively provided legal advice to KLS and consulted with ADA specialist attorneys" concerning Plaintiff's email, doctor's note, and intent not to travel. Doc. No. 57-17 at ¶¶ 39-41. These discussions ultimately led KLS to provide Plaintiff a letter on April 19, 2021, via email, "summarizing [Plaintiff's] deficient job performance and lack of candor and consistency in communications with Mr. Flower, and advising [Plaintiff] that KLS would set those issues aside in a good faith effort to engage in the ADA [i]nteractive [p]rocess." Doc. No. 57 at pgs. 4-5; Doc. No. 55-2 at pgs. 18-21. KLS intended for the April 19, 2021, letter to be "a formal legal document attempting to initiate the ADA interactive process," which is why Attorney Lunny signed the letter as Secretary and General Counsel for the company. Doc. No. 57-17 at ¶ 44.

On April 23, 2021, one of Attorney Lunny's Burr & Forman colleagues emailed Plaintiff to "facilitate the interactive process in order to determine whether [Plaintiff had] a qualifying disability and if that disability necessitate[d] a reasonable accommodation[.]" Doc. No. 57-14 at

pg. 2. On April 26, 2021, KLS' counsel received a response from Plaintiff's lawyer, who stated she was retained to represent Plaintiff in connection with KLS' request for medical records. Doc. No. 57-15. Plaintiff's counsel also requested that KLS' counsel provide a number of company policies, Plaintiff's job description, and a copy of Plaintiff's personnel file. Id.

For the next few months, KLS "continued to consult with Mr. Lunny and other Burr [&] Forman attorneys for legal advice regarding [Plaintiff's] continued job performance issues and his refusal, through his lawyer, to engage in the ADA [i]nteractive [p]rocess with KLS, his lawyer's adversarial communications with KLS' attorneys, and the likelihood of [Plaintiff] filing a lawsuit against KLS." Doc. No. 57-16 at ¶ 21; Doc. No. 57-12 at ¶ 22; see Doc. No. 57-17 at ¶ 45 (Lunny testifying that he and ADA specialist attorneys at his firm continued to "provide[] legal advice to KLS concerning the ADA interactive process" and Plaintiff's "refusal to travel in contravention of" his job requirements).

"Throughout April and into May 2021," Plaintiff did not travel to support costumers or sales personnel in his District. Doc. No. 57-1 at ¶ 35. On or around June 9, 2021, "KLS consulted with [Attorney Lunny] and other Burr & Forman attorneys concerning its determination to terminate [Plaintiff's] employment for, among other things, his continued failure to travel to support" the healthcare provider customers and failure to engage in the interactive process. Doc. No. 57-17 at ¶ 49. KLS terminated Plaintiff on June 10, 2021. Doc. No. 57 at pg. 5.

***Attorney Lunny's Role at KLS***

Attorney Lunny is an equity party at Burr & Forman and has been a lawyer for approximately 35 years. Doc. No. 57-17 at ¶¶ 2-4. Attorney Lunny first represented KLS in or around 1992 or 1993, and he has "represented KLS on more or less a continuous basis since that time." Id. at ¶ 13. In 1995, Attorney Lunny became KLS' "corporate" Secretary. Id. at ¶ 14. In

that role, his duties "are limited to recording minutes of the annual meeting of the partnership and its general partner, making sure that the state registrations for those entities are maintained on an annual basis, drafting and signing occasional corporate resolutions, and signing the occasional document when a corporate Secretary signature is required." Id. at ¶ 15. He takes "about three to five hours on average . . . each year" to perform these duties and is not compensated by KLS for these services. Id. at ¶ 16.

Besides serving as KLS' Secretary, Attorney Lunny also serves as KLS' General Counsel, a role he assumed in or around 1997. Id. at ¶ 17. As General Counsel, Attorney Lunny provides a variety of legal services to KLS. See id. As relevant here, Attorney Lunny provides "legal advice to [KLS] concerning a range of employment law related matters, including laws in all 50 states related to the employment, discipline and termination of KLS sales force personnel." Id. at ¶ 23. He "routinely provide[s] legal advice to KLS executives concerning planned discipline or employment termination for KLS' management level sales force employees located throughout the country." Id. at ¶ 25. Attorney Lunny has "a team of lawyers who [he] work[s] with closely on legal matters for KLS" at his firm's local office. Id. at ¶ 40. When appropriate, as was the case on March 22, 2021, Attorney Lunny consults with colleagues from other Burr & Forman offices to advise KLS on legal matters. Id. He refers to these lawyers as "outside counsel" because "they are outside of [his] regular client-service team for KLS." Id.

In 2024, well after Plaintiff's termination from KLS, KLS "adopt[ed] a limited number of 'c-suite' positions and [Attorney Lunny] became the Chief Legal Officer for KLS in addition to continuing to be the General Counsel." Id. at ¶ 18. Attorney Lunny asserts that the change was in title only and had no effect on the services he provided to KLS. Id. (noting that the minutes from the annual meeting in which the c-suite positions were adopted confirm that Attorney Lunny "is

appointed to the office of CLO of the Partnership and will also retain his office as Secretary & General Counsel of the Partnership."). Despite the new title, Attorney Lunny is not "directly employed by [KLS]" nor does he appear on KLS' website in this capacity. Id. at ¶¶ 18, 20. Moreover, Attorney Lunny testified that he is not on KLS' website, has never had a KLS e-mail address, has communicated with KLS exclusively through his law firm e-mail address at both his prior and current employer, and that he is paid directly by Burr & Forman, which bills KLS for his legal fees and exceptional reimbursement costs. Id. at ¶¶ 19, 20, 22.

Attorney Lunny, Mr. Cantin, Mr. Flower, and Mr. Ticoras all attest that Mr. Lunny was engaged to provide legal advice to KLS regarding the circumstances surrounding Plaintiff's performance issues, accommodation request, and termination. See id. at ¶¶ 35, 49-51; Doc. No. 57-1 at ¶¶ 34, 37; Doc. No. 57-12 at ¶¶ 9, 18, 23; Doc. No. 57-16 at ¶¶ 12, 18-19, 21.

***Depositions of KLS' Witnesses***

Plaintiff deposed Attorney Lunny, Mr. Cantin, Mr. Flower, and Mr. Ticoras. See generally Doc. No. 55-1. During Attorney Lunny's deposition, defense counsel made "'a blanket objection and instruct(ed) [Attorney Lunny] not to answer anything that's attorney/client privilege'" when Plaintiff's counsel began questioning Attorney Lunny about the April 19, 2021 letter he authored. Doc. No. 55-1 at pg. 5 (alterations in original) (quoting Doc. No. 55-4 at pg. 14). Plaintiff contends that when Plaintiff's counsel asked "Attorney Lunny to explain the factual bases for the allegations of misconduct Attorney Lunny levied against Mr. Guide in the letter," defense counsel instructed Attorney Lunny not to answer, citing the attorney-client privilege. Id. For example, when Plaintiff's counsel asked about Attorney Lunny's statement in the April letter that Plaintiff's "poor customer management performance resulted in losing Maine Medical Center as a provider customer," the following exchange occurred:

> *Plaintiff's Counsel*: So how did Mr. Guide's alleged poor customer management performance result in KLS losing Maine Medical Center as a provider customer?
>
> *Defense Counsel*: To the extent that that question requests information that Mr. Lunny learned from his client in providing legal advice, that is privileged information. I agree with you that the facts, as stated in the letter are not a privilege that have been waived, but the underlying communications were part of Mr. Lunny's representation of KLS. And I'm instructing him not to answer.

Doc. No. 55-4 at pgs. 18-19; see Doc. No. 55-1 at pgs. 5-6. In accordance with counsel's instruction, Attorney Lunny did not answer that question. Doc. No. 55-4 at pg. 20.

KLS similarly asserted the attorney-client privilege when Plaintiff's counsel asked Attorney Lunny about KLS' termination of an employee under Plaintiff's supervision, an event which was referenced in the April letter. Doc. No. 55-1 at pg. 6. Thus, as the deposition transcript reveals, Plaintiff's counsel asked the following question, and Defendant's counsel gave the following instruction:

> *Plaintiff's Counsel*: Okay. What events led to the termination of Trevor Fiedler?
>
> *Defense Counsel*: Same objection. That goes to attorney/client privileged communications with Mr. Lunny's client. I'm instructing him not to answer.

Doc. No. 55-4 at pg. 19. Plaintiff contends that KLS asserted the privilege selectively by objecting to these questions on the one hand but allowing Attorney Lunny to testify regarding the facts he learned from KLS regarding what the letter characterized as Plaintiff's "gross misconduct" on the other hand. Doc. No. 55-1 at pg. 7 (citing Doc. No. 55-2).

Plaintiff also takes issue with KLS' assertion of the attorney-client privilege during the depositions of members of KLS' executive and management teams. Id. at pg. 8. For instance, at the deposition of Mr. Ticoras, the following exchange occurred:

> *Plaintiff's Counsel*: Is it fair to say that you ultimately approved the decision to terminate Mr. Guide's employment?

> *Mr. Ticoras*: Approved, I believe, yes. Based on what we were -- what I was told, I was okay with the termination.
>
> *Plaintiff's Counsel*: Based on what you were told by whom?
>
> *Mr. Ticoras*: My meeting [with] general counsel.
>
> *Plaintiff's Counsel*: So did you rely on general counsel to provide you the facts on which you decided to approve the termination decision?
>
> *Defense Counsel*: Objection. Privileged Information. You don't need to answer that.

Doc. No. 55-5 at pgs. 3-4. Plaintiff also contends that KLS' counsel similarly instructed Mr. Cantin and Mr. Flower not to answer certain questions regarding the termination decision, among other topics, all on the basis of privilege. See Doc. Nos. 55-1 and 62.

***The Present Discovery Dispute***

Plaintiff moves to compel deposition testimony and the production of the twenty-six (26) documents KLS identified on its privilege log, claiming that Defendant improperly invoked the attorney-client privilege. Doc. No. 55-1. With respect to the deposition testimony, Plaintiff asserts that his deposition questions sought factual information unprotected by attorney-client privilege, rather than communications that occurred for the purpose of obtaining legal advice, and thus the invocation of privilege was improper. Id. Alternatively, Plaintiff argues that to the extent the privilege applies, Defendant waived it "by placing material with respect to which it claims privilege (specifically, the April 19, 2021, letter) at issue in the litigation and by using the privilege as both a sword and a shield." Doc. No. 55 at pg. 2.

Plaintiff requests that the court reopen Attorney Lunny's deposition and order him to "testify fully and responsively—without any instructions not to answer—regarding his knowledge pertaining to his April 19, 2021, letter to Mr. Guide, Mr. Guide's March 22, 2021, e-mail and the defendant's response thereto, and the defendant's decisions to discipline and fire Mr. Guide." Doc.

No. 55-1 at pg. 2. Plaintiff also asks the court to order KLS "to produce for further deposition witnesses who refused to answer deposition questions based on instructions from [KLS'] counsel." Id. at pg. 3.

Regarding the documents identified on KLS' privilege log, Plaintiff asserts that KLS improperly withheld twenty-six (26) emails, "from March 22, 2021, through June 10, 2021," which relate to Plaintiff's performance issues, the interactive process, and the termination decision. Id. at pg. 9; see Doc. No. 55-6. Specifically, Plaintiff maintains that KLS' decision to withhold these materials on the grounds of the attorney-client privilege and/or work product doctrine was inappropriate because the record lacks evidence demonstrating that procuring legal advice was the primary purpose of these e-mail communications. Doc. No. 55-1 at pg. 9.

KLS objects and maintains that its invocation of the attorney-client privilege was proper. See generally Doc. No. 57 and 66. Further, KLS disputes that it waived the privilege with respect to its communications with Attorney Lunny (and/or his colleagues). Doc. No. 57. Therefore, KLS objects to the reopening of any depositions or the forced disclosure of the items identified in its privilege log. Id.

## DISCUSSION

### I. Defendant's Procedural Arguments

#### A. Timeliness

Defendant argues, as an initial matter, that Plaintiff's motion to compel should be denied because "it was filed on the last day of discovery after an extensive discovery period and long periods of discovery inactivity." Doc. No. 57 at pg. 12. KLS contends that Plaintiff's "counsel was aware of KLS' position that its communications with Mr. Lunny are privileged in January [2025], when KLS served its Privilege Log; in July [2025], when KLS' counsel raised concerns

regarding Mr. Lunny's deposition; and in September [2025], when KLS' counsel asserted the attorney-client privilege during the depositions of Messrs. Ticoras and Cantin." Id. at pg. 11. Defendant asserts that under these circumstances, Plaintiff's motion comes too late. Id. at pgs. 11-12.

"A district court's case-management powers apply with particular force to the regulation of discovery and the reconciliation of discovery disputes." Faigin v. Kelly, 184 F.3d 67, 84 (1st Cir. 1999). Federal Rule of Civil Procedure 16 provides that the magistrate judge shall set the trial dates and litigation schedule in a scheduling order issued after consulting with the parties at a scheduling conference. See Fed. R. Civ. P. 16(b)(1)(A)-(B). "Where, as here, the scheduling order fixes no specific deadline for filing motions to compel, courts 'look to the deadline for completion of discovery.'" Negron v. DeFelice, No. 17-CV-95-LM, 2018 WL 2272780, at *1 (D.N.H. May 17, 2018) (quoting Days Inn Worldwide Inc. v. Sonia Invs., 237 F.R.D. 395, 397 (N.D. Tex. 2006) (collecting cases)).

In this case, the deadline to complete discovery was October 7, 2025. Doc. No. 53-1; Endors. Ord., 7/8/25 (Saint-Marc, J.). Plaintiff filed his motion to compel on October 7, 2025, before the deadline expired. See Doc. No. 55. After reviewing the relevant history, the court is not persuaded by KLS' argument that Plaintiff was dilatory in challenging KLS' assertion of the attorney client privilege, particularly where KLS, "as the party claiming the privilege and refusing to answer the questions, had the burden of moving for a protective order and failed to do so." Borase v. M/A COM, Inc., 171 F.R.D. 10, 13 (D. Mass 1997). Accordingly, the court will not deny the motion on this ground alone.

B. Compliance with Local Rules

Defendant next argues that Plaintiff's motion should be denied because Plaintiff's counsel failed to "make a good faith attempt to obtain concurrence in the relief sought as required by LR 7.1(c), and the Motion's cursory statement that his counsel addressed the issues raised in the Motion with KLS' counsel 'to no avail' is not true." Doc. No. 57 at pg. 12. The local rules of this district require that "[a]ny party filing a motion other than a dispositive motion shall certify to the court that a good faith attempt has been made to obtain concurrence in the relief sought." LR 7.1(c). The court is satisfied, based on the representations that Plaintiff's counsel made in his motion and based on the parties' representations during oral argument, that the movant satisfied the requirements of Local Rule 7.1(c) and that concurrence in this matter was not possible. Therefore, the court will not deny Plaintiff's motion to compel on this basis.

**II. KLS' Assertion of the Attorney-Client Privilege during Depositions**

Plaintiff contends that KLS improperly invoked the attorney-client privilege during the deposition of Attorney Lunny and the depositions of members of KLS' executive and senior management team. Specifically, Plaintiff argues that KLS cannot carry its burden to demonstrate that the subject communications between KLS and Attorney Lunny, who Plaintiff characterizes as KLS' in-house counsel, were for the purpose of rendering or soliciting legal advice. Doc. No. 55-1 at pgs. 9-12. Plaintiff further contends that in any event, the attorney-client privilege does not shield disclosure of the underlying facts. Id. Accordingly, he seeks relief in the form of an order authorizing the reopening of the challenged depositions. See generally Doc. No. 55.

KLS argues that Plaintiff's "arguments depend upon a mischaracterization of [Attorney] Lunny's role at KLS and an unsupported assertion that Mr. Lunny could not possibly have given legal advice if he is not an expert in employment discrimination law." Doc. No. 57 at pg. 14. KLS

contends that its invocation of the attorney-client privilege was proper because all of the communications between KLS and its attorneys (i.e., Attorney Lunny and his Burr & Forman colleagues) concerning Plaintiff were made in confidence and for the purpose of securing legal advice. Id. at pgs. 12-14. Finally, KLS maintains that it has not blocked discovery of facts, but rather "has engaged in extensive discovery concerning the facts that [Plaintiff] claims KLS is trying to shield." Id. at pg. 15.

A. Legal Standard

The Federal Rules of Civil Procedure contemplate broad discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The attorney client privilege, which is governed by federal common law in a federal question case such as the present matter, see Fed. R. Evid. 501; see also Smith v. Alice Peck Day Mem'l Hosp., 148 F.R.D. 51, 53 (D.N.H. 1993), is recognized as the oldest privilege relating to confidential communications. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). In this context, the attorney-client privilege "protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." United States v. SpineFrontier, Inc., 160 F.4th 212, 220 (1st Cir. 2025) (quotation marks omitted) (citations omitted). The privilege "attaches to corporations as well as to individuals." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985).

The party invoking the attorney-client privilege bears the burden of establishing its application to the communications at issue, and courts must narrowly construe the privilege because it comes with "substantial costs and stands as an obstacle of sorts to the search for truth." In re Keeper of Recs. (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir.

2003). Thus, the privilege extends only to "communications that are confidential and are made for the purpose of seeking or receiving legal advice." Id.

B. Attorney Lunny's Role within KLS

Plaintiff's challenge to Defendant's assertions of privilege are premised, in part, on a mischaracterization of Attorney Lunny's relationship with KLS. Doc. No. 55-1 at pgs. 11-12. Thus, Plaintiff argues that Attorney Lunny is KLS' in-house counsel, and therefore, the court should apply "heightened scrutiny" to determine whether the subject communications were made for the purpose of seeking or receiving legal advice. Id. (quoting Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B, 230 F.R.D. 398, 411, n.20 (D. Md. 2005) (citation omitted) (noting that "many courts impose a higher burden on in-house counsel to 'clearly demonstrate' that advice was given in a legal capacity.")). Relying on the federal district court decisions in Borase and Dadosky, Plaintiff argues that courts reject attempts at using the attorney-client privilege to block discovery of communications related to personnel decisions in employment discrimination cases in which an attorney is acting as defendant's in-house counsel. Doc. No. 55-1 at pg. 11; Borase, 171 F.R.D. at 13-16; Dadosky v. Mid-Am. Conversion Servs., LLC, No. 2:22-CV-02503, 2025 WL 1104560, at *3–7 (S.D. Ohio Apr. 14, 2025). KLS asserts that Plaintiff's reliance on Borase and Dadosky is misplaced. Doc. No. 57 at pg. 13. The court agrees.

In Borase, the defendant company instructed its former Corporate Secretary and General Counsel not to respond to questions posed during his deposition regarding conversations he had with other senior management related to plaintiff's "discharge from employment, the possibility that [plaintiff] might bring a discrimination charge against the company, the terms and conditions of the proposed separation agreement," and disputes regarding plaintiff's entitlement to or

forfeiture of certain stock. 171 F.R.D. at 13. The company argued that "it [was] evident from the nature and circumstances of [the lawyer's] discussions" with various members of senior management "that the substance of those discussions [was] privileged." Id. (quotations omitted).

In considering whether the assertion of privilege was proper, the court explained that "if an in-house counsel has other nonlegal responsibilities, the party invoking the privilege has the burden of producing evidence in support of its contention that in-house counsel was engaged in giving legal advice and not in some other capacity at the time of the disputed conversations." Id. at 14. The court concluded that the defendant "failed to carry its burden of demonstrating that [general counsel] was acting as an attorney, rather than a businessman" because defendant failed to provide sufficient evidence to support its contention that the attorney was acting in a legal rather than a business role. Id. at 15-16 (noting "there [was] a notable lack of evidence submitted by the defendant in support of its position."). The court specifically noted that "there [were] no affidavits on record from the participants in these discussions confirming that legal advice was being sought or rendered." Id. at 15.

In Dadosky, which Plaintiff contends is "closely analogous" to the instant case, Doc. No. 55-1 at pg. 11, the plaintiff sued her former employer for employment discrimination based on her termination following the company's rejection of her request for a religious accommodation and her refusal to get the COVID-19 vaccine in compliance with company directives. 2025 WL 1104560 at *1-2. During the deposition of the company's human resources manager, the defendant's counsel instructed the witness not to answer questions related to the company's "Accommodations Review Committee," which consisted of in-house counsel and executive leaders. Id. at *2 (quotations omitted). The defendant argued that the Committee's discussions were protected by the attorney-client privilege. Id. at *2-3. The plaintiff, on the other hand, argued

that assertion of the privilege was improper because "the Committee engaged in primarily a business function and its predominant purpose was to decide employment matters," and "[a]ny participation by in-house counsel . . . was incidental to that business function." Id. at *4.

The court concluded that the defendant "fail[ed] to carry its burden to show that the Committee discussions [p]laintiff seeks to disclose were for the purpose of rendering or soliciting legal advice." Id. at *6. The court explained that the "'mere fact that [the defendant's] in-house counsel was present at a Committee meeting does not shield otherwise unprivileged communications from disclosure.'" Id. (quoting Neuder v. Battelle Pacific Northwest Natl. Laboratory, 194 F.R.D. 289, 293 (D.D.C. 2000) (cleaned up)). The court also ordered the defendant "to submit additional evidence clarifying the basis of the attorney-client privilege." Id. at *7.

This court agrees with KLS that Borase and Dadosky are distinguishable from the circumstances here. Those courts had to determine whether in-house counsel, who regularly wore multiple hats in a company, was engaged in legal versus non-legal work. Here, the record does not support Plaintiff's characterization of Attorney Lunny as KLS' in-house counsel. Rather, the record is clear that although Attorney Lunny served as the Secretary and General Counsel of KLS during the relevant period, those titles did not alter the overall nature of his relationship with the company. See Doc. No. 57-17 at ¶¶ 14, 18. Therefore, the record establishes that Attorney Lunny acted as an outside lawyer hired by KLS to provide legal services and not as an employee working for the company with the company as his sole client. See id.; see also United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 360 (D. Mass. 1950) ("The distinction [between in-house counsel and outside counsel] is chiefly that the house counsel gives advice to one regular client, the outside counsel to several regular clients.").

In his capacity as KLS' outside counsel, Attorney Lunny (and his colleagues) billed KLS for legal services through Burr & Forman, was not on KLS' employee payroll for his General Counsel role, and communicated with KLS exclusively through his Burr & Forman email address. Doc. No. 57-17 at ¶¶ 16-20. In contrast to the circumstances presented in Borase and Dadosky, Attorney Lunny's responsibilities as Secretary for KLS amounted to only three to five hours per year and were "limited to recording minutes of the annual meeting of the partnership and its general partner, making sure that the state registrations for those entities are maintained on an annual basis, drafting and signing occasional corporate resolutions, and signing the occasional document when a corporate secretary signature is required." Id. at ¶¶ 15-16. To put it simply, Attorney Lunny's non-legal role as Secretary of KLS was limited and wholly unrelated to the issues raised in this discrimination litigation.

Based on these facts, there can be no credible argument that Attorney Lunny was wearing his Secretary hat, as opposed to his outside counsel hat, at the time of the disputed communications. Therefore, the court declines to apply heightened scrutiny to the communications at issue. The question whether the attorney-client privilege protects those communications from disclosure therefore turns on whether the communications were made for the purpose of obtaining or providing legal advice.

C. Counsel was Engaged in Providing Legal Advice

After careful review of the deposition transcripts and the affidavits, the court is satisfied that KLS carried its burden to demonstrate that Attorney Lunny was included in the subject communications for the purpose of providing legal and not merely business advice. The record contains consistent affidavit testimony demonstrating that KLS consulted Attorney Lunny and engaged in communications with him for the purpose of obtaining legal advice regarding

Plaintiff's circumstances. See, e.g., Doc. No. 57-17 at ¶¶ 35, 49-51; Doc. No. 57-1 at ¶¶ 34, 37; Doc. No. 57-12 at ¶¶ 9, 18, 23; Doc. No. 57-16 at ¶¶ 12, 18-19, 21. For example, once Mr. Flower became aware of and alerted Mr. Cantin to Plaintiff's poor job performance, Mr. Cantin consulted Attorney Lunny regarding "possible disciplinary action . . . and related legal considerations," including KLS' compliance with "the CISA directive and other applicable laws." Doc. No. 57-12 at ¶¶ 3, 5, 9; Doc. No. 57-17 at ¶ 36. Upon Plaintiff's disclosure of a medical condition in his March 22, 2021 email, Mr. Cantin "consulted with [Attorney] Lunny and other Burr [&] Forman attorneys for legal advice" regarding Plaintiff's medical condition, management concerns, and "related legal implications, including but not limited to a possible need to initiate an interactive process under the Americans with Disabilities Act." Doc. No. 57-12 at ¶ 18. Attorney Lunny testified in his affidavit that he and his colleagues at Burr & Forman began "actively provid[ing] legal advice" regarding these same issues, which ultimately led to Attorney Lunny's April 19, 2021 letter summarizing concerns about Plaintiff's job performance and "attempting to initiate the ADA interactive process." Doc. No. 57-17 at ¶¶ 41-42. KLS also engaged Attorney Lunny concerning its decision to terminate Plaintiff in early June 2021. Id. at ¶ 49.

The reasons provided by KLS for attorney engagement support a finding that Attorney Lunny was engaged to provide legal advice to KLS regarding Plaintiff's circumstances. This conclusion is consistent with the undisputed evidence that Attorney Lunny "routinely" provides KLS with legal advice concerning employment matters,[3] Doc. No. 57-12 at ¶ 10, including legal issues associated with "discipline or employment termination for KLS' management level sales

---

[3] The court is not persuaded by Plaintiff's contention that "[i]t defies logic that Attorney Lunny would have rendered advice on [Plaintiff's] accommodation request" given Attorney Lunny's lack of expertise in employment discrimination law. Doc. No. 55-1 at pg. 12. Neither Attorney Lunny's statements in his deposition nor the record before the court supports Plaintiff's conclusion regarding Attorney Lunny's experience.

force employees." Doc. No. 57-17 at ¶ 25. Because Attorney Lunny's Secretary duties are outside the scope of the disputed circumstances, and because KLS routinely sought legal advice from Attorney Lunny and his firm on employment matters such as Plaintiff's, the court concludes that KLS provided sufficient evidence to establish that the challenged communications with Attorney Lunny were made for the purpose of obtaining legal rather than business advice. For the same reasons, the court concludes that KLS' assertion of the attorney-client privilege in relation to the documents identified in its privilege log was proper.[4] Accordingly, the court finds no error with KLS' invocation of the attorney-client privilege regarding its communications with Attorney Lunny and his colleagues.

D. Whether KLS Blocked Discovery of Facts

Plaintiff argues that KLS cannot assert the attorney-client privilege to block the disclosure of relevant underlying facts, even if the substance of the communications is protected. See Doc. No. 55-1 at pg. 12. "The attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that the disclosure would reveal confidential communications." Anderson v. Eastern CT Health Network, Inc., No. 3:12CV785 RNC, 2014 WL 109115, at * 4 (D. Conn. Jan. 10, 2014) (bracket omitted) (quotations omitted); Upjohn Co., 449 U.S. at 390, 395 (1981) (noting the privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney"). "In other words, 'the contents of communications are privileged, but information relating to them, such as the communications' subject matter, is not.'" Anderson, 2014 WL 109115 at *4 (quoting Haddock v. Nationwide Financial Services, Inc., No. 3:01CV1152(SRU), 2009 WL 3734059, at *1 (D.

[4] Because the court determined that KLS' assertion of the attorney-client privilege in its privilege log was proper, it need not analyze whether the other privileges that KLS asserted were also justified.

Conn. Nov. 06, 2009)). The party seeking disclosure is entitled to pose questions "at a sufficiently abstract level so as to not reveal the substance of the advice." Elliott Associates, L.P. v. Republic of Peru, 176 F.R.D. 93, 97 (S.D.N.Y. 1997).

The court is not persuaded by Plaintiff's argument that enforcement of the privilege prevents him from discovering information regarding KLS' allegedly adverse employment actions against him. Doc. No. 55-1 at pg. 2; see Doc. No. 62. As KLS noted in its objection to the motion to compel, see Doc. No. 57 at pg. 8, and as the record demonstrates, Plaintiff engaged in discovery related to the underlying facts in Attorney Lunny's April letter. See, e.g., Doc. No. 57-20. For instance, Plaintiff engaged in discovery regarding the termination of KLS employee Trevor Fielder. Specifically, Plaintiff issued document requests ("RFP") to KLS, wherein Plaintiff requested, among other things, that KLS produce "[d]ocuments evidencing and/or containing communications in which [KLS] participated pertaining to the decision to terminate Trevor Fieldler." Doc. No. 57-20 at ¶ 31 (quoting Doc. No. 57-22 at pg. 8) (internal quotation marks omitted). In response, KLS produced "58 documents totaling 233 pages," which included "text messages between Mr. Fiedler and healthcare provider customer representatives[,] . . . emails between Mr. Guide and his supervisor regarding the termination of Trevor Fiedler's employment, and Mr. Fiedler's letter of resignation. Plaintiff also asked Mr. Flower about this topic during his deposition, and Mr. Flower testified to the non-privileged facts within his knowledge. Doc. No. 57-20 at ¶ 33; Doc. No. 57-27 at pgs. 5-7.

Plaintiff also engaged in discovery regarding KLS' alleged loss of Maine Medical Center as a customer. Specifically, in his RFPs to KLS, Plaintiff requested "[d]ocuments evidencing [KLS'] loss of Maine Medical Center as a customer." Doc. No. 57-22 at pg. 8. In response, KLS provided "business records that evidence[d] its loss of Maine Medical Center as a customer." Id.

Plaintiff also requested that KLS produce all communications related to its loss of Maine Medical Center as a customer, and KLS produced all non-privileged communications in response. Id. at pg. 8 (responding to RFP 22). Plaintiff also asked Mr. Flower questions about this topic during his deposition, and Mr. Flower testified to the facts based on his independent knowledge. Doc. No. 57-20 at ¶ 36; Doc. No. 57-27 at pgs. 7-11. These are just a few examples, but review of the record further supports KLS' assertion that it has not blocked the discovery of non-privileged facts.

## III. Waiver

Plaintiff disputes the application of the attorney-client privilege, but argues that to the extent it applies, KLS waived the privilege with respect to its communications with Attorney Lunny regarding the topics raised in Attorney Lunny's April 19, 2021 letter. Doc. No. 55-1 at pgs. 12-13. Specifically, Plaintiff contends KLS uses the "so-called privileged information as a sword to assail [him] with allegations of gross misconduct, while at the same time using privilege to shield itself from [Plaintiff's] deposition questions designed to show that allegations underlying his written warning . . . amount to pretext." Id. Plaintiff also asserts that KLS further waived the privilege regarding the letter because "the letter is 'at issue' in the litigation." Id. at pg. 13 (quoting Mass. Mut. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 293 F.R.D. 244, 248 (D. Mass. 2013).

Although KLS concedes that "the facts recited in [Attorney] Lunny['s] April 19, 2021 letter were not privileged," KLS maintains that it did not waive the attorney-client privilege regarding the underlying communications between Attorney Lunny and KLS regarding the content of the letter. Doc. No. 57 at pg. 15; Doc. No. 55-4 at pg. 19. KLS also argues that it did not waive the privilege regarding these communications "through selective disclosure of facts," or "by placing the communications 'at issue.'" Doc. No. 57 at pg. 14. The court agrees with KLS.

"Waiver can be express or implied." Walker v. N.H. Administrative Office of the Courts, Civ. No. 11-cv-421, 2013 WL 672584 at *6 (D.N.H. Feb. 22, 2013); see Mass. Mut. Life Ins. Co., 293 F.R.D. at 248 (quoting Granite Partners, L.P., et al. v. Bear, Stearns & Co., Inc., et al., 184 F.R.D. 49, 54 (S.D.N.Y. 1999) (citation omitted) ("It is well settled that waiver may be imposed when the 'privilege-holder has attempted to use the privilege as both a 'sword' and a 'shield.'")). In the absence of an express waiver, an "[i]mplied waiver[] may be found where a party seeks to use the privilege as both a sword and shield . . . ." Id. "'Claims of implied waiver must be evaluated in light of principles of logic and fairness' in a manner involving 'a fastidious sifting of the facts and a careful weighing of the circumstances.'" Id. (quoting In re Keeper of Records, 348 F.3d at 23). As the party invoking the privilege, KLS bears the burden of establishing that it has not been waived. In re Keeper of Records, 348 F.3d at 22.

After carefully weighing the facts and circumstances present, the court concludes that KLS carried its burden of establishing that KLS has not waived its privilege with respect to its communications with Attorney Lunny and/or his colleagues regarding the April 19 letter. Although the parties agree that the facts in Attorney Lunny's April 19, 2021 letter are not privileged, there is nothing in the letter that identifies any advice that Attorney Lunny provided to KLS, nor is there any indication of KLS' communications with Attorney Lunny regarding Plaintiff's accommodation request and KLS' response to the same. See Doc. No. 55-2. Therefore, the court declines to find waiver on this basis.

Likewise, the court is not persuaded by Plaintiff's assertion that KLS placed Attorney Lunny's letter at issue and thus effected an at-issue waiver. Doc. No. 55-1 at pg. 13. Plaintiff points to no affirmative action that KLS took to place the protected communications at issue for its own benefit (such as the assertion of an advice of counsel defense) or to enmesh the privileged

communications underlying the April letter in KLS' defense of this matter, and the court finds none in the record. See Mass. Mut. Life. Ins. Co., 294 F.R.D. at 249; see Doe v. Lahey Health Sys., Inc., No. 19-cv-11014-PBS, 2020 WL 13561720, at *4 (D. Mass. Aug. 12, 2020) (despite receipt of attorney advice, attorney-client privilege is waived only if advice is asserted as defense). Therefore, the court cannot conclude that KLS waived the attorney-client privilege on this ground.

## CONCLUSION

Accordingly, for the foregoing reasons, Plaintiff's motion is denied.

SO ORDERED.

Talesha L. Saint-Marc
United States Magistrate Judge

September 30, 2026

cc: Counsel of record